


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4:24-CR- |
| RICHARD R. SHIH | 4-24CR-272-O |

## INFORMATION

The United States Attorney Charges:

### Overview

1.  As described below, between at least September 2018 to May 2022, Defendant **Richard R. Shih ("SHIH")** knowingly and willfully participated in a conspiracy, the object of which was to export items and commodities from the United States to one or more prohibited persons on the Entity List of the United States Department of Commerce, Bureau of Industry and Security (BIS), and to engage in transactions with one or more such prohibited persons, without obtaining a license from BIS.

### Statutory and Regulatory Background

#### The Export Control Reform Act and Export Administration Regulations

2.  Enacted into law in August 2018, the Export Control Reform Act (ECRA) provided that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items . . . be controlled . . . ." 50 U.S.C.

§ 4811(2). To that end, ECRA granted the President the authority to "control . . . the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons." 50 U.S.C. § 4812(a)(1).

3.  ECRA further granted the Secretary of Commerce the authority to establish the regulatory framework. 50 U.S.C. §§ 4812, 4813, 4810(10). Pursuant to that authority, BIS promulgated the Export Administration Regulations (EAR)—Title 15, Code of Federal Regulations, Parts 730–774—to regulate the export of goods, technology, and software from the United States.

4.  Through the EAR, BIS reviewed and controlled the export of certain items from the United States to foreign countries. *See* 15 C.F.R. Parts 734.2–734.3. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR imposed licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. The export restrictions imposed on items subject to the EAR depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

5.  Within this regulatory framework, the term "subject to the EAR" was broadly defined to generally include, among other things, "[a]ll items in the United States" and "[a]ll U.S. origin items wherever located." 15 C.F.R. § 734.3. The term

"export" also was broadly defined to generally include, among other things, "[a]n actual shipment or transmission out of the United States, including the sending or taking of an item out of the United States, in any manner." 15 C.F.R. § 734.13.

6. The EAR classified and defined various parties to an export transaction. *See* 15 C.F.R. § 748.5. Among others, those parties included a "[p]urchaser," "[i]ntermediate consignee," "[u]ltimate consignee," and "[e]nd-user." *Id.* § 748.5(c)–(f); *see also id.* § 772.1 (listing definitions of terms used in the EAR, including those for the aforementioned parties).

7. The EAR defined the term "[p]rincipal parties in interest" as "[t]hose persons in a transaction that receive the primary benefit, monetary or otherwise, of the transaction. Generally, the principals in a transaction are the seller and the buyer. In most cases, the forwarding or other agent is not a principal party in interest." 15 C.F.R. § 772.1. In addition, the EAR defined the term "[i]ntermediate consignee" as "[t]he person that acts as an agent for a principal party in interest for the purpose of effecting delivery of items to the ultimate consignee. The intermediate consignee may be a bank, forwarding agent, or other person who acts as an agent for a principal party in interest." *Id.* Further, the EAR defined the term "[u]ltimate consignee" as "[t]he principal party in interest located abroad who receives the exported or reexported items. The ultimate consignee is not a forwarding agent or other intermediary, but may be the end-user." *Id.* Under the EAR, a receiving agent in a foreign country who acted on the behalf of a

foreign principal party in interest for the purpose of effecting the delivery of items exported from the United States to that party was an "intermediate consignee."

8.  The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL"), set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items on the CCL were categorized by specific Export Control Classification Numbers ("ECCN"), each of which had export control requirements depending on final destination, end use, and end user. The remaining items that were subject to the EAR, but not listed on the CCL, were classified as "EAR99."

Entity List

9.  In February 1997, BIS published the first Entity List as part of its efforts to inform the public of entities that have engaged in activities that could result in an increased risk of the diversion of items exported from the United States to weapons of mass destruction programs. Since its initial publication, grounds for inclusion on the Entity List have expanded to activities sanctioned by the State Department and activities contrary to U.S. national security and foreign policy interests.

10. The Entity List, found in Supplement No. 4 to Part 744 of the EAR, contained a list of names of certain foreign persons—including businesses, research institutions, government and private organizations, individuals, and other types of legal persons—that were subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items. On an individual basis, persons on the

Entity List were subject to licensing requirements and policies in addition to those found elsewhere in the EAR.

11. The Entity List specified the license requirements imposed on each listed person. Those license requirements were independent of, and in addition to, license requirements imposed elsewhere in the EAR. BIS evaluated license applications to any listed entity according to the policy stated in the "License Review Policy" column of the Entity List. If any applicable policy required denial, BIS would deny the application, even if another policy generally provided for approval.

Prohibitions Relating to Export Controls and Export Information

12. A provision of ECRA, 50 U.S.C. § 4819(a)(1), provided that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or other authorization issued under this subchapter, including any of the unlawful acts described in [50 U.S.C. § 4819(a)(2)]." ECRA also provided, in 50 U.S.C. § 4819(a)(2)(G), that "[n]o person may engage in any transaction or take any other action with intent to evade the provisions of this subchapter, the Export Administration Regulations, or any order, license, or authorization issued thereunder." In addition, 50 U.S.C. § 4819(a)(2)(F) provided that "no person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, either directly to the Department of Commerce . . . or indirectly through any other person" in several enumerated circumstances, including "in the course

of an investigation or other action subject to the [EAR]," and "in connection with effecting any export [or] re-export" of an item subject to the EAR.

13. In addition, for all exports valued over $2,500, or for which an export license was required for shipment outside the United States, the U.S. seller, manufacturer, exporter, or its shipping agent was required to file detailed information with the U.S. government to assist in "prevent[ing] the export of certain items to unauthorized destinations and/or end users." 15 C.F.R. § 30.1(b). This information was submitted electronically by filing Electronic Export Information (EEI) in the Automated Export System (AES) with the United States government. EEI included, among other things, detailed information about the seller, manufacturer, or exporter; the date of export; the ultimate end-user; the country of ultimate destination; the value of the goods being exported; the ECCN; and if applicable, the export license number. In filing such information with the United States Government, the filer would be certifying that the EEI was true, accurate, and complete. *See* 15 C.F.R. § 758.1(f). At all relevant times, it was unlawful to knowingly fail to file or knowingly submit false or misleading export information via the AES. *See* 13 U.S.C. § 305.

## Relevant Persons and Entities

14. **SHIH** was the founder of "Company 1," which was incorporated in approximately 1986. At its incorporation, **SHIH** was an owner of Company 1. Beginning in 1986 until approximately August 2018, **SHIH** was the chief executive of Company 1. Following the hiring of a new chief executive for Company 1 in

approximately August 2018, **SHIH** continued to be an employee and agent of Company 1 through at least May 2022 and continued to be a consultant until the end of 2024. From at least August 2018 through May 2022, **SHIH** was responsible for customer relations for large companies doing business with Company 1.

15. Company 1 was an international logistics company and freight forwarder incorporated in the State of California and headquartered in Inglewood, California. At all times relevant to the conspiracy, Company 1 conducted business from its Inglewood headquarters; within the Northern District of Texas, Fort Worth Division, at Company 1's branch office in Grapevine, Texas; and from approximately five other branch offices located throughout the United States (as well as from several other branch offices in other countries including Mexico and Canada). As of 2024, Company 1 advertised that it had over 200 employees working from sixteen branch locations spanning eight countries in North America and Europe. At all times relevant to the conspiracy, Company 1 provided air and ocean freight, warehousing, logistics, and other services to customers in the United States and abroad.

16. "Employee 1" was an employee of Company 1 from approximately 2000 to the present. Employee 1 established Company 1's online account for AES in approximately 2003 and thereafter served as the account administrator. During the conspiracy, Employee 1 also held a supervisory role in Company 1's accounting department.

17. "PRC Individual 1" was a Chinese national who managed and co-owned a freight forwarding company, Seajet Company Limited ("Seajet"), which operated in the People's Republic of China ("PRC") during the conspiracy. PRC Individual 1 and Seajet were added to the Entity List pursuant to a BIS final rule on or about September 4, 2018, ("September 2018 Rule") for being involved in activities contrary to the national security and foreign policy interests of the United States.[1] *See* 83 Fed. Reg. 44,821 (Sept. 4, 2018).

18. From September 4, 2018, and continuing until the present, the entries on the Entity List for PRC Individual 1 and Seajet imposed a license requirement "[f]or all items subject to the EAR." Under the September 2018 Rule, this license requirement applied "to any transaction in which items are to be exported, reexported, or transferred (in-country) to [PRC Individual 1 or Seajet] or in which such entities act as purchaser, intermediate consignee, ultimate consignee, or end-user." The September 2018 Rule further provided that no license exceptions would be available, and that the license review policy for any application to BIS for a license to export, re-export, or transfer (in-country) an item to PRC Individual 1 or Seajet, or to engage in a transaction in which PRC Individual 1 or Seajet acted as a purchaser, intermediate consignee, ultimate consignee, or end-user, was a "[p]resumption of denial." Thus, given the regulatory

---

[1] The Entity List entry for PRC Individual 1 included both his given name and an alias he regularly used to conduct business with persons in the United States, including **SHIH** and Company 1.

framework summarized above, the September 2018 Rule effectively made unlawful the shipment abroad without a license of any item—even items not otherwise subject to BIS controls under the CCL—to PRC Individual 1 or Seajet, or to a recipient as to whom PRC Individual 1 or Seajet acted as one of the aforementioned parties to an export transaction, to include a party acting as a receiving agent within the PRC.

19.     Hisiang Logistics Company Limited ("Hisiang") was a freight forwarding business with operations in China that, for the relevant periods during the conspiracy, was operated or used in some fashion by PRC Individual 1. On or about June 1, 2021, BIS issued a final rule ("June 2021 Rule") revising the Entity List entry for Seajet to reflect that Hisiang was an alias of Seajet. At relevant times during the conspiracy, Hisiang was in effect an alter ego of Seajet with respect to the objects of the conspiracy.

## COUNT ONE
**Conspiracy to Commit Offenses Against the United States**
(Violation of 18 U.S.C. § 371)

20. Paragraphs 1 through 19 of this Information are realleged and incorporated fully herein.

21. Between at least on or about September 6, 2018, and continuing to on or about May 18, 2022, in the Northern District of Texas and elsewhere, **SHIH**, Company 1, employees of Company 1, and others, known and unknown, knowingly and willfully conspired and agreed together and with each other, and with other persons, to knowingly and willfully export and cause the export of items and commodities from the United States to one or more prohibited persons on the Entity List, and to engage in transactions in which one or more such prohibited persons acted as a party to an export transaction as defined in the EAR, 15 C.F.R. § 748.5(c)–(f), without obtaining a license from BIS, in violation of Title 50, United States Code, Section 4819(a)(1), 4819(a)(2)(A)–(B), and 4819(b); and Title 15, Code of Federal Regulations, Parts 736.2(b)(5), 736.2(b)(10), and 744.11(a).

### Object of the Conspiracy

21. The object of the conspiracy was for one or more conspirators to receive items and commodities in the United States and thereafter export the same to one or more prohibited persons on the Entity List, in particular, PRC Individual 1, Seajet, and/or Hisiang, and engage in transactions in which one or more such prohibited persons acted

as a party to an export transaction as defined in the EAR, 15 C.F.R. § 748.5(c)–(f), without obtaining the required licenses and in violation of U.S. export law.

### Knowledge of Entity Listing

22. On or about March 30, 2018, PRC Individual 1 sent an e-mail with the subject line "name change" to **SHIH** and others, stating in relevant part that beginning in April 2018, "Seajet will start using a new company name for all international business i.e. Hisiang Logistics Company Limited. There is nothing else changed such as company address, structure and policy etc." **SHIH** forwarded the e-mail to approximately ten Company 1 employees while copying PRC Individual 1 and several of his employees. **SHIH** and the Company 1 employees who received the e-mail understood that PRC Individual 1 and other individuals copied on the e-mail were employees of Seajet.

23. On or about December 4, 2018, approximately three months after PRC Individual 1 and Seajet were added to the Entity List, one or more BIS officials visited Company 1's New York City branch office to discuss the September 2018 Rule's prohibitions. Following the visit, a BIS official reviewed records provided by Company 1, which revealed that it had used an account code assigned to Seajet in shipping an item to Hisiang.

24. On or about November 18, 2020, one or more BIS officials conducted an outreach at Company 1's branch office in Grapevine, Texas, during which a Company 1 employee provided a list of persons and companies with whom Company 1 would not do business. Notwithstanding the events described above, as of November 2020, this list did

not include PRC Individual 1, Seajet, or Hisiang.

25. On or about March 10, 2021, Employee 1 sent an e-mail instructing Company 1 team leaders "not to use/show Seajet or Hisiang as a consignee, handling agent or notify party" on records relating to Company 1 shipments.

### Manner and Means of the Conspiracy

26. The objects of the conspiracy were to be accomplished in substance as follows.

27. As of September 2018, Company 1 had conducted shipping transactions and exports to one or more companies controlled by PRC Individual 1 for over a decade, including over two thousand exports to Seajet in the period from December 2010 to April 2018. After the addition of PRC Individual 1 and Seajet to the Entity List in September 2018, Company 1, **SHIH**, and other members of the conspiracy agreed that Company 1 would nonetheless continue to export items and commodities from the United States to PRC Individual 1 and/or Hisiang, and engage in transactions in which one or more such prohibited persons acted as a party to an export transaction as defined in the EAR, 15 C.F.R. § 748.5(c)–(f), without obtaining the required licenses.

28. During the conspiracy, **SHIH** was aware that Hisiang was an alias for Seajet, and that Company 1 shipped items and commodities from the United States to the PRC for which an identified recipient or party to the transaction was Hisiang during the period of the conspiracy. In addition, at relevant times during the conspiracy, multiple individuals employed by Company 1, including **SHIH**, were a party to communications

exchanged with employees of Seajet and/or Hisiang, which communications were in furtherance of the objects of the conspiracy.

29.     After September 2018, individuals employed by or acting on behalf of PRC Individual 1 and/or Hisiang would contact Company 1 to make arrangements for the shipment of items and commodities originating from suppliers and distributors in the United States to PRC Individual 1's and/or Hisiang's customers in China. PRC Individual 1 and/or Hisiang acted as a receiving agent in China for such shipments, and in doing so acted as a party to the transaction as defined in the EAR, 15 C.F.R. § 748.5(c)–(f). Company 1 did not include this information in its filings of EEI for the shipments.

30.     Neither Company 1 nor any other party involved in such shipments of items and commodities to Hisiang's and/or PRC Individual 1's customers obtained the required BIS licenses, and the shipments were thus unlawful. Company 1, **SHIH**, and others were aware that such shipments at relevant times during the conspiracy were unlawful.

## Overt Acts

32.  Coconspirators committed the following acts in furtherance of the conspiracy.

33.  Between on or about September 6, 2018, and May 18, 2022, Company 1 caused the export of over one thousand shipments of items and commodities from the United States, including from the Northern District of Texas, Fort Worth Division, to Beijing, Shanghai, and other cities within the PRC, to customers of PRC Individual 1 and/or Hisiang, through PRC Individual 1 and/or Hisiang, who were then acting and operating from within the PRC, at their direction.  Company 1 employees were aware that the required BIS licenses were not obtained for these shipments.  Company 1 employees used the names of certain of the aforementioned freight forwarders and aliases in Company 1's internal records for these shipments.

34.  Between on or about September 4, 2018, and May 23, 2022, PRC Individual 1 and/or his affiliated businesses, including Hisiang, and others, caused the transmission of approximately 34 international wire transfers of funds denominated in U.S. dollars, originating from accounts held with PRC-based financial institutions, to accounts held by a United States financial institution belonging to Company 1. Company 1 used the incoming transferred funds to pay various expenses on the transactions (e.g., air carriers and trucking companies) while retaining a portion of the funds as profit.

35.     On or about September 27, 2019, a Company 1 employee emailed an executed "Non-Exclusive Agency Agreement" between Company 1 and Seajet to an employee of PRC Individual 1, while copying **SHIH** and PRC Individual 1 on the email. The Company 1 employee sent the aforementioned email after receiving an instruction to do so from **SHIH**.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

36. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

37. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of conspiracy to violate ECRA, in violation of Title 18, United States Code, Section 371, and Title 50, United States Code, Section 4819(a)–(b), defendant **SHIH** shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

38. If any of the property described above, as a result of any act or omission of defendant **SHIH**:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

                              LEIGHA SIMONTON
                              UNITED STATES ATTORNEY

By: _____
      JAY WEIMER
      Assistant United States Attorney
      Texas State Bar No. 24013727
      801 Cherry Street, Suite 1700
      Fort Worth, Texas 76102
      Telephone: 817-252-5200
      Facsimile: 817-252-5455


                              JENNIFER KENNEDY GELLIE
                              EXECUTIVE DEPUTY CHIEF,
                              PERFORMING THE DUTIES OF CHIEF

By: _____
      DAVID J. RYAN
      Trial Attorney
      D.C. Bar No. 888325195

      BRETT C. REYNOLDS
      Trial Attorney
      D.C. Bar No. 996100

      National Security Division
      Counterintelligence and Export Control Section
      950 Pennsylvania Avenue, NW, Room 7700
      Washington, DC, 20530
      Telephone: 202-233-0986
      Facsimile: 202-532-4251